HANDY ANDY T.V. AND APPLIANCES, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Handy Andy T.V. & Appliances, Inc. v. Commissioner
Docket No. 4244-81.
United States Tax Court
T.C. Memo 1983-713; 1983 Tax Ct. Memo LEXIS 73; 47 T.C.M. (CCH) 478; T.C.M. (RIA) 83713; November 30, 1983. Harold L. Perry, for the petitioner. Donna I. Epstein, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioner's income taxes and additions to tax for the years and in the amounts as follows: Deficiencies
Additions to Tax,
Fiscal Year
in
I.R.C. 1954
Ending
Income Tax
Sec. 6653(a) [1]
October 31, 1973
$7,821
$391
October 31, 1974
26,291
1,315
October 31, 1975
93,936
4,697
October 31, 1976
63,510
3,176
October 31, 1977
7,031
352
The issues for our decision are (1) whether petitioner's method of deferring prepaid service policy contract income clearly reflected its income; (2) whether petitioner changed its method of accounting for prepaid service policy contract income and therefore must include in its income for fiscal year ending October 31, 1975, section 481 adjustments for fiscal years ending October 31, 1970 through 1974; (3) whether in fiscal years ending October 31, 1976 and 1977, petitioner may deduct $139,700 and $227,130, respectively, as payments to Handy Andy Associates, Inc., made pursuant *75 to a Service Agreement and Amendment and applicable to services rendered in petitioner's subsequent fiscal years; (4) whether petitioner's bad debt writeoff accurately reflected its bad debt experience; and (5) whether all or a portion of petitioner's underpayment of taxes is due to negligence within the meaning of section 6653(a). [2]
FINDINGS OF *76 FACT Some of the facts have been stipulated and are found accordingly. Petitioner, Handy Andy T.V. and Appliances, Inc., a California corporation incorporated in 1959, had its principal place of business in Sacramento, California, at the time of filing its petition in this case. Petitioner, which keeps its records and files its returns on an accrual basis for a fiscal year ending October 31, filed its Federal income tax returns for its fiscal years 1972, 1973, 1974, 1975 and 1976 with the Internal Revenue Service Center, Fresno, California. Petitioner is in the business of retail sales of televisions, audio equipment and major home appliances. It also operates a service department for the maintenance and repair of these products. Petitioner maintains six stores in Northern California. Until October 31, 1976, petitioner directly employed clerical workers and repair technicians to provide its repair services. Customers could obtain these repair services either by paying cash at the time of repair or by demand pursuant to prepaid service policy contracts. At the time a customer purchased a television, stereo equipment, or home appliance, petitioner's salesman offered *77 for purchase a service policy contract. The service policy contracts sold between 1959 and April 1, 1970, typically covered labor and parts for a 1-year service period. Petitioner also offered a 2-year package service policy applicable after expiration of the factory warranty. These service policy contracts covered "only such service and maintenance * * * as are necessitated by * * * normal usage as determined by Handy Andy." Provision 14 of the pre-April 1970 service policy contracts allowed cancellation "by either party at any time, upon written notice. Upon cancellation by Handy Andy, a refund will be made on a pro rata basis of the considerations stated above." [3]
Prior to 1970, for income tax accounting purposes, petitioner included in its reportable income total revenues from cash service calls, calls made under service policy contracts, and service policy contract sales. As petitioner incurred the expenses of running its service department, including replacement *78 parts, salaries and wages, it deducted them. However, on its internal books, petitioner amortized the full amount of the prepaid service policy contract income over the respective lives of the service policy contracts. Under its financial accounting procedure, initially petitioner deposited the prepaid service policy income into a cash received account and made an offsetting entry into "deferred income," a liability account.Thereafter, it ratably included the prepaid income in its recognizable current income account. For example, if a $60 service policy contract had a term of 12 months (a portion of which may or may not have pertained to petitioner's current fiscal year and the balance may or may not have applied to its subsequent taxable year), at the time of a customer's purchase of such contract, petitioner initially reflected on its books a $60 credit to a cash received account and a $60 credit to a liability account, labeled as "deferred income." At the close of each month, petitioner debited the liability account by one-twelfth of the prepaid service policy contract income, $5 in the example, and credited its current income account with the same amount. On April 1, 1970, petitioner *79 introduced new service policy contracts into its business. All new service policy contracts, regardless of the product, were governed by the same basic provisions but varied in length of service period from 1 to 5 years. Unlike the old service policy contracts, the new ones provided for a $6 deductible, whereby the "policyholder pays [the] first $6 for each service after expiration of [the] factory warranty." The $6 deductible served as a deterrent against customers' "nuisance" requests for the repair of nonexistent problems; under the old service policy contracts petitioner estimated that a significant number of its repair calls were nuisance requests. The new service policy contracts provided that repairs would be made "only within the service area of any Handy Andy location." As with the old service policy contracts, provision 13 of the new contracts stated that the contract "may be canceled by either party at any time upon written notice.Upon cancellation by Handy Andy, a refund will be made on a pro rata basis of the considerations stated above." [4] The new contracts obligated petitioner to perform maintenance and repair services, as needed, upon customers' demands. *80 As with the pre-April 1, 1970, service policy contracts, for financial accounting purposes petitioner amortized the full amount of the prepaid service policy contract income over the respective lives of the contracts. The initial book entries were made to a cash received account in the amounts of the full contract sales prices and to a liability account labeled as "deferred income" in an equal amount. Monthly, petitioner credited its current income account and debited its deferred income account by a pro rata portion of the remaining unamortized prepaid service policy income. As with the old service policy contracts, the prepaid income from new service policy contracts was deposited into petitioner's general bank account for its use without limitation. On January 7, 1971, petitioner's officers discussed the income tax accounting method that should be utilized with regard to the new service policy contracts. According to draft minutes of the meeting, the officers-- felt that service costs can be accurately ascertained from [its] available [historical business experience] statistics but pointed out that profit factors would have to be removed from labor and material costs. *81 Upon resolution presented and adopted, it was decided that the receipts from service contracts would be reported for tax purposes in the year of receipt and that an advance deduction would would [sic] be computed to offset such income. For Federal income tax purposes, attached schedules to income tax returns filed for fiscal years 1970 through 1976 showed that petitioner reported with "other income" the total amount of prepaid service policy contracts income as reduced by a deduction for an amount estimated by its accountant to be the costs of performing anticipated future repair services under the unamortized portion of the service policy contracts. These estimated costs were based on petitioner's historical costs for past services performed pursuant to a pool of similar service policy contracts. The service policy contracts were profitable, and petitioner reported its deferred income account balance in fiscal years ending October 31, 1969 through October 31, 1977, as follows: Fiscal
Total Increase
Deduction
Amount
Year
In Deferred Income
For Estimated
Reported
Ending
Account
Future Costs
Other Income
1969
$597.45
$597.45
1970
113,217.00
$83,316.00
29,901.00
1971
12,175.00
6,522.00
5,653.00
1972
16,162.00
6,793.00
9,369.00
1973
16,838.00
5,296.00
11,542.00
1974
25,754.00
9,145.00
16,609.00
1975
25,668.00
9,905.00
15,763.00
1976
30,586.00
11,671.00
18,915.00
1977
36,165.00
10,115.00
26,050.00
*82 Prior to November 1, 1976, Keith Anderson, Elizabeth A. Anderson, Glenn Hardin and Lory Saxton were officers of petitioner. In October 1976, a plan to form a new corporation was conceived in order to provide laborers to petitioner on a contract basis. [5] On November 1, 1976, the new corporation, Handy Andy Associates, Inc. (Associates), was formed.Stock was issued to three employees of Associates for a total of $3,000. After Associates' formation, petitioner's sole employees and officers were Keith and Elizabeth Anderson; effective November 1, 1976, all other prior employees and officers of petitioner were hired by and became employees of Associates. On October 28, 1976, petitioner and Associates entered into a Service Agreement which stated that Associates would render services and would provide "at its expense, all the personnel that in its judgment may be needed to provide sales, administrative, clerical and maintenance personnel for Handy Andy." The Service *83 Agreement gave Associates "full control of the performance of service by its personnel," but vested in petitioner "the authority to determine whether services of Associates are satisfactory to it." By provision 4, the Service Agreement stated that-- In consideration of the services performed by Associates, Handy Andy shall pay to Associates a sum of money, monthly, bi-monthly, quarterly, semi-annually, or annually as the parties herein from time to time may mutually agree; and enter such agreement, as provided in the Appendix A attached hereto and made a part hereof. Said sums may be payable in installments as may be mutually agreed by Associates and Handy Andy, but shall become an unconditional liability of Handy Andy on the date of execution of said Appendix A. [6]
On October 31, 1977, petitioner and Associates executed an Amendment to Service Agreement in which they agreed that sales personnel would be provided by Associates outside of provision 4 of the Service Agreement. Instead, petitioner was to reimburse Associates at least monthly for Associates' compensating the sales personnel. *84 The Amendment to Service Agreement further stated that petitioner may advance funds to Associates to meet its payroll provided that such advances would be deemed a loan and would be refundable to petitioner on demand. It became petitioner's and Associates' business practice typically to renegotiate the contract payments on a bi-monthly basis. Petitioner paid the funds to Associates in advance to the time that Associates was obligated to pay its payroll. The amounts paid by petitioner to Associates usually exceeded the amounts that Associates incurred for its payroll and other expenses. Petitioner's daily operations did not "change a great deal" as a result of the formation of Associates. The major change involved petitioner's finances.Prior to the formation of Associates, petitioner paid salaries directly to its clerical workers and service technicians; as of November 1, 1976, petitioner paid to Associates approximately $170,000 to $180,000 per month which Associates utilized to cover its expenses, including the wages of these workers. Associates deposited these sums into its bank account and did not refund any portion of these amounts to petitioner.However, after November 1, 1976, special *85 attention was given to assure that the proceeds from sales of service policy contracts were deposited into petitioner's bank account rather than into Associates' bank account. On its income tax returns for fiscal years ending October 31, 1975, 1976 and 1977, petitioner showed an increase in prepaid service policy contract income in the amounts of $25,668, $30,586 and $36,165, respectively. For fiscal years ending October 31, 1975, 1976 and 1977, petitioner claimed deductions from these increases in its prepaid service policy contract income for the estimated costs of future repair and maintenance services in the amounts of $9,905, $11,671 and $10,115, respectively.For fiscal year ending October 31, 1977, petitioner claimed a net operating loss carryback to fiscal year ending October 31, 1974, of $42,698. For fiscal years ending October 31, 1976 and 1977, petitioner reported earned investment tax credits of $8,842 and $5,796, respectively. For fiscal year ending October 31, 1976, petitioner claimed a $139,700 deduction for salaries and wages. Petitioner and Associates fixed the amount in their Service Agreement which pertained to services that Associates' employees would perform *86 for petitioner commencing November 1976, the first month of petitioner's subsequent fiscal year. On its income tax return for fiscal year ending October 31, 1977, petitioner claimed a $227,130 deduction for salaries and wages. Petitioner and Associates fixed this amount in their Service Agreement which pertained to services that Associates' employees would perform for petitioner commencing November 1977, the first month of petitioner's subsequent fiscal year. In his statutory notice of deficiency, respondent disallowed the deductions from service policy income for fiscal years ending October 31, 1975, 1976 and 1977 with the explanation that-- The $9,905.00, $11,671.00 and $10,115.00 deducted from service policy income on your returns for the taxable years ended October 31, 1975, October 31, 1976, and October 31, 1977, are not allowed. Estimated costs are not accruable and are not deductible as the liability is not definitely fixed nor can the amount be ascertained with reasonable certainty. Also, you cannot defer or postpone the reporting of income that has actually been received. Furthermore, your deduction of the above amounts represents a change in your method of accounting *87 made without the permission of the Commissioner and which is not accepted by the Commissioner. Accordingly, your taxable incomes for the taxable years ending October 31, 1975, October 31, 1976, and October 31, 1977, are increased by $9,905.00, $11,671.00 and $10,115.00, respectively. Respondent reduced the claimed deduction for salaries and wages for fiscal years ending October 31, 1976 and 1977 with the explanation that-- 1b. The deduction for salaries and wages taken on your returns for the taxable years ended October 31, 1976, and October 31, 1977, are reduced by $139,700.00 and $87,430.00, respectively. These amounts were accrued under a service agreement with Handy Andy Associates which has no business purpose other than to increase a tax deduction. These amounts are also non-deductible because they represent compensation for future services and because the liability is not definitely fixed nor can the amount be ascertained with reasonable certainty. Accordingly, taxable income is increased as computed below: Taxable Years Ended
October 31, 1976)
October 31, 1977
November 1976 Salary Deducted
$139,700.00
$139,700.00
November and December 1977
Salary Deducted
227,130.00
$139,700.00
$ 87,430.00
*88 Respondent made additional adjustments with respect to petitioner's reported income and deductions as follows: 1d. Your taxable income for the taxable year ended October 31, 1975 is increased $111,072.00 as computed below for the deductions you took for estimated costs accrued on your returns for the taxable years ended October 31, 1970 to October 31, 1974 inclusive. In the tax table year ended October 31, 1970, you changed your method of accounting of reporting without the permission of the Commissioner and therefore these deductions become taxable in the first open year which is your taxable year ended October 31, 1975. Taxable Year Ended
Amount of Deduction
October 31, 1970
$ 83,316.00
October 31, 1971
6,522.00
October 31, 1972
6,793.00
October 31, 1973
5,296.00
October 31, 1974
9,145.00
Total
$111,072.00
1e. It is determined that your experience reflects a bad debt writeoff of 3.8% of outstanding receivables for taxable year ended October 31, 1975; therefore, the reserve for bad debt is adjusted and taxable income is increased by $6,000.00, as computed below: Reserve per return
$24,000.00
Reserve corrected ($466,327 X 3.8%)
18,000.00 (rounded)
Increase in taxable income
$ 6,000.00
*89 This adjustment was agreed by you. OPINION The first issue for decision is whether petitioner's method of reporting prepaid service policy contract income on a pro rata basis rather than in full at the time of receipt clearly reflected its income. In its petition and on brief, petitioner takes the position that the prepaid service policy contract income received from its customers was a "conditional refundable deposit" reportable as current income as earned by petitioner upon its future rendition of repair services demanded by its customers. At trial and on brief, petitioner argued a second theory--that its present prepaid service policy contract income was essentially deferrable because it could be offset by claiming a present deduction of a reserve amount for estimated expenses for future services available to customers over the remaining periods of the service policy contracts. Petitioner's estimate of these future expenses was based on its historical costs for past services performed pursuant to a pool of similar service policy contracts. Respondent takes the position that petitioner should have reported the prepaid service policy contract revenues in full at the time *90 received and that petitioner was not entitled to any offsetting deduction for estimated future expenses. We agree with respondent that neither of petitioner's positions should be sustained. Resolution of this issue is based upon financial accounting and income tax accounting principles and objectives. These may be divergent. As stated by the Supreme Court in Thor Power Tool Co. v. Commissioner,439 U.S. 522, 542-543 (1979)-- The primary goal of financial accounting is to provide useful information to management, shareholders, creditors, and others properly interested; the major responsibility of the accountant is to protect these parties from being misled. The primary goal of the income tax system, in contrast, is the equitable collection of revenue; the major responsibility of the Internal Revenue Service is to protect the public fisc. Consistently with its goals and responsibilities, financial accounting has as its foundation the principle of conservatism, with its corollary that "possible errors in measurement [should] be in the direction of understatement rather than overstatement of net income and net assets." In view of the Treasury's markedly different *91 goals and responsibilities understatement of income is not destined to be its guiding light. Given this diversity, even contrariety, of objective, any presumptive equivalency between tax and financial accounting would be unacceptable.
This difference in objectives is mirrored in numerous differences of treatment. Where the tax law requires that a deduction be deferred until "all the events" have occurred that will make it fixed and certain, United States v. Anderson,269 U.S. 422, 441, 46 S.Ct. 131, 134, 70 L.Ed. 347 (1926), accounting principles typically require that a liability be accrued as soon as it can reasonably be estimated. Conversely, where the tax law requires that income be recognized currently under "claim of right," "ability to pay," and "control" rationales, accounting principles may defer accrual until a later year so that revenues and expenses may be better matched. Financial accounting, in short, is hospitable to estimates, probabilities, and reasonable certainties; the tax law, with its mandate to preserve the revenue, can give no quarter to uncertainty. * * * [Fn. ref. omitted.] However, regardless of the divergent goals of financial *92 accounting and income tax accounting, accrual basis accounting under both accounting systems is based upon the premise of matching revenues with expenses. Due to varying objectives, as expressed by the Supreme Court in Thor Power Tool Co.,supra, the timing for proper matching of revenues and expenses may differ under the two accounting systems.Under financial accounting principles, expenditures for particular periods of time are charged against the income generated during that same period. For tax purposes, income generated during a specific taxable period is offset only by related expenses which can be predicted with reasonable certainty. With the financial accounting and tax accounting principles and objectives in mind, this Court and other courts consistently have held that an accrual basis taxpayer is not entitled to report only a portion of advance payments received from customers by characterizing such payments as deposits. Automobile Club of New York v. Commissioner,32 T.C. 906 (1959), affd. 304 F.2d 781 (2d Cir. 1962); S. Garber, Inc. v. Commissioner,51 T.C. 733 (1969); Moritz v. Commissioner,21 T.C. 622 (1954). *93 In Automobile Club of New York v. Commissioner,supra, the taxpayer's members paid annual club membership dues in advance of services to be rendered for emergency road service, travel assistance, personal accident insurance, bail bonds and other similar services. The club was an accrual basis taxpayer. The taxpayer reported members' initiation fees in full as income in the taxable year of receipt but reported annual dues ratably as current income. The taxpayer credited the full amount of the annual dues collected to a reserve account and, on a monthly basis, debited one-twelfth of that amount and transferred it to the current income account. The dues were nonrefundable and were deposited into the club's bank account available for use without restriction. The club's monthly and annual expenses associated with the rendition of its services to members depended wholly on members' demands and generally could not be estimated in advance. There was variation in the average monthly costs per member for services within any given taxable year. Additionally, pursuant to contracts with service stations and automobile accessory stores the club sold "savings plan coupons" *94 to them for distribution to the taxpayer's members as they made purchases from the distributors. The coupons were distributed in an amount equal to 10 percent of the members' purchases. Club members could redeem the coupons by crediting them against annual club membership dues or could obtain a cash refund from the taxpayer. When the taxpayer sold the coupons to the distributors, it deposited the sales proceeds into its general bank account and used the funds without restriction. However, the taxpayer failed to report the income from the coupon sales in the taxable year received and failed to account for the amount of the redeemed coupons. Instead the taxpayer credited the coupon sale proceeds to and debited redemptions from a reserve account. In holding that the full amount of the dues paid in advance and prepaid coupon income was reportable as income in the year received, this Court stated (at 913-916): But where there is actual receipt and the funds are at the unrestricted disposal of the taxpayer, as is the case here, all the events have already occurred that call for accrual.It has not been the practice in tax accounting to enter upon a further inquiry as to whether the *95 income has been "earned" in order to defer the reporting of such income to a later year. * * * * * * Moreover, the amounts received do not cease to be "income" under the statute merely because all the expenses allocable to the earning of such income have not yet been incurred. * * * net income under the statute is computed on an annual basis, and, as pointed out above, there is no necessary correlation in any given year between receipts and expenses. * * * * * * We have had a number of occasions in the past to consider similar contentions, in analogous situations, and have repeatedly held that unrestricted income, subject only to a contingent liability to refund in future years, must be reported in the year of receipt, with the consequence that deductions for refunds may be taken in the year in which such refunds are in fact made. * * * The result is required by the system of reporting income on the basis of annual accounting periods. * * * Finally, petitioner's argument that it did not "own" the proceeds but held them subject to a "trust" for its members has no support in the record, particularly in view of petitioner's stipulation that the funds might be used for *96 general corporate purposes. * * * In S. Garber, Inc. v. Commissioner,supra, the taxpayer, a seller of fur pelts at wholesale and tailoring and selling custom-made fur coats at retail, required that its customers pay prior to the taxpayer's making the ordered fur coat. The taxpayer included the advance payments in income in the year that the fur coat was delivered to the customer rather than in the year the advance was received. We held that-- under accrual accounting where there is actual receipt, as in this case, and the funds are at the unrestricted disposal of the taxpayer, as in this case, all the events have occurred that call for accrual and that no further inquiry is necessary to determine whether the income has been earned. * * * * * * the advance payments constitute income in the year of receipt. * * * * * * the possibility of refunds was nothing more than a contingent liability which had no bearing on the taxpayer's right to the deposit when received. * * * In the instant case there was no direct evidence that any advance payment had ever been refunded. * * * [S. Garber, Inc. v. Commissioner,supra at 735-736.] *97 Similarly, in Moritz v. Commissioner,supra, the accrual basis taxpayer, a photographer, received customers' deposits for portraits in one taxable year and reported this income on an accrual basis in the following year when the portraits were completed and accepted. Relying upon the cases of Spring City Foundry Co. v. Commissioner,292 U.S. 182 (1934), and North American Oil Consolidated v. Burnet,286 U.S. 417 (1932), we held that as the taxpayer received the deposits, he obtained an unrestricted right to dispose of them as he wished. The possibility that the customers might ask for refunds of their deposits was labeled a contingent liability which did not excuse the taxpayer from reporting the deposits in full at the time of receipt. By comparison to the above cases, in the instant case petitioner obtained all service policy contract income at the time that its customers purchased these contracts. Petitioner deposited these funds into its general bank account without segregation and petitioner was not limited in its use of these funds. The record does not contain any evidence that petitioner in fact made any refunds *98 even though the service policy contracts provided that a pro rata refund would be made upon their cancellation by petitioner and even though petitioner's president testified that it was petitioner's practice to make such ratable refunds after April 1970. We conclude that the possibility that petitioner would make such refunds constituted only a contingent liability which did not affect petitioner's right to the prepaid service policy contract income upon receipt. Petitioner's second argument--that it is entitled to a deduction for estimated future costs associated with the service policy contracts--is in conflict with the rationale of a trilogy of cases decided by the Supreme Court. In the first case of the trilogy, Automobile Club of Michigan v. Commissioner,353 U.S. 180 (1957), as in the later case of Automobile Club of New York,supra, the taxpayer received membership dues prepaid for 1 year for which the taxpayer agreed to provide repair services as needed upon the demands of its members. The taxpayer credited its deferred income account upon receipt of the dues and, on a ratable basis, accounted for the dues in current income over the *99 12 months following their receipt. The Court rejected the taxpayer's monthly proration of the prepaid membership dues, and in so holding stated: The pro rata allocation of the membership dues in monthly amounts is purely artificial and bears no relation to the services which petitioner may in fact be called upon to render for the member. * * * [Fn. ref. omitted.] [American Club of Michigan,supra at 189.] In footnote 20 (at 189), the Court distinguished two prior cases, Beacon Publishing Co. v. Commissioner,218 F.2d 697 (10th Cir. 1955), revg. 21 T.C. 610 (1954), and Schuessler v. Commissioner,230 F.2d 722 (5th Cir. 1956), revg. 24 T.C. 247 (1955), in which the circuit courts had allowed the taxpayers to defer reporting advance payments. [7] The Supreme Court noted that the Beacon and Schuessler cases involved services which the taxpayers were obligated to perform at specified future dates, whereas the automobile club was not bound to perform particular services for members at specific future times. *100 In the second case of the trilogy, American Automobile Assn. v. United States,367 U.S. 687 (1961), on facts essentially the same as in Automobile Club of Michigan,supra,American Automobile Association (AAA) utilized basically the same method for deferring advance receipts as did the Automobile Club of Michigan. However, AAA presented statistical evidence showing that, taking the members as a group, AAA's method of ratably including prepaid membership dues over the 12-month membership period indicated a correlation between its actual total costs and total revenues. Yet, the Supreme Court held that AAA's method of accounting was as artificial as the accounting method utilized by the Automobile Club of Michigan. The Court was not convinced that the taxpayer's reliance upon data regarding groups or pools of members and upon average monthly costs per member could establish that the taxpayer had sufficiently fixed liabilities for purposes of accrual basis tax accounting. The Court stated (at 692-693) that-- The Code exacts its revenue from the individual member's dues which, no one disputes, constitute income. When their receipt as earned *101 income is recognized ratably over two calendar years, without regard to correspondingly fixed individual expense or performance justification, but consistently with overall experience, their accounting doubtless presents a rather accurate image of the total financial structure, but fails to respect the criteria of annual tax accounting and may be rejected by the Commissioner. * * * the federal revenue cannot, without legislative consent and over objection of the Commissioner, by made to depend upon average experience in rendering performance and turning a profit. * * * The Court indicated that when future services are to be performed upon the demand of another party with the time of such performance not fixed, a taxpayer is not entitled to defer the reporting of advance payments for such services if it merely shows its record of historical expenses for services performed for a pool of its payees. The third case in the trilogy, Schlude v. Commissioner,372 U.S. 128 (1963), involved a taxpayer who ran a dance studio. He offered dance lessons pursuant to two plans: A cash plan contract, which required a cash downpayment with the balance due in installments, *102 and a deferred payment plan, which required a portion of the downpayment to be paid in cash with the downpayment balance due in installments and the remaining amount represented by a promissory note payable at specific times. The contracts were noncancellable and the amounts were non-refundable.Each contract provided for a specific number of lesson hours and a designated time frame in which to complete the lessons; however, the contract did not contain a schedule of specific dates for the lessons. The taxpayer was on an accrual basis and, for each student, its income from the contract was allocated on the basis of total hours of lessons taken as compared to total hours of lessons purchased. When a student's account was inactive for more than 12 months, the entire balance of the prepaid contract income was reported. The Court held that the taxpayer's method of accounting did not clearly reflect its income and that the taxpayer should have included in its current income advance payments of cash, negotiable notes, and due but unpaid contract installments. The Court stated that its decision was controlled by its prior holding in American Automobile Assn.,supra, *103 and that an additional ground for disallowing the taxpayer's accounting method, also contained in American Automobile Assn., was its artificiality in deferring income where services were rendered solely "upon customers' demands without relation to fixed dates in the future." Schlude v. Commissioner,supra at 135. Although the taxpayer based its recognition of income regarding inactive accounts on an individual basis, in footnote 9 (at 136), the Court noted that the taxpayer's system was defective because it arbitrarily decided to consider the contract canceled after 12 months of inactivity. This trilogy of Supreme Court decisions suggests that a taxpayer must include prepaid service contract income in the taxable year received unless he can demonstrate that a particular amount of future performance of services under such a contract is assured with reasonable certainty. Such a showing may be based upon contract terms or historical data regarding services performed for the specific payee. [8] Numerous cases decided subsequent to the trilogy are consistent with this principle. E.g. RCA Corp. v. United States,664 F.2d 881 (2d Cir. 1981); *104 Allied Fidelity Corp. v. Commissioner,572 F.2d 1190 (7th Cir. 1978), affg. 66 T.C. 1068 (1976); Chesapeake Financial Corp. v. Commissioner,78 T.C. 869 (1982); Standard Television Tube Corp. v. Commissioner,64 T.C. 238, 241-242 (1975), where we stated that the "deferral of reporting prepaid income on the theory that it has not yet been 'earned' by the performance of services, delivery of goods, or the giving of other consideration has been continually rejected." Cf. Boise Cascade Corp. v. United States,530 F.2d 1367 (Ct.Cl. 1976); Artnell Co. v. Commissioner,400 F.2d 981 (7th Cir. 1968), revg. a Memorandum Opinion of this Court. In RCA Corp. v. United States,supra, the taxpayer, either directly or *105 through its wholly owned subsidiary, serviced television sets and other consumer products that it sold. When customers purchased products, the taxpayer and its subsidiary offered to sell them service contracts entitling them to receive maintenance and repair services on the products purchased for a stated period of time. The maintenance and repair services were available upon the purchasers' demands. The taxpayer and its subsidiary utilized an accrual method of accounting and credited to its current income account that portion of service contract income which represented the actual cost of selling and processing the contract, plus a profit. The balance of the prepaid service contract income represented a portion of the revenues to be earned through future performance of services under the service contracts, and this amount was credited to a deferred income account. After the initial entry, each month petitioner ratably credited current income and debited the deferred income account by the amount estimated to have been earned in the month through the actual performance of services. The taxpayer based these estimates on past experience; the estimates were found to be reasonably *106 accurate. In reversing the district court, the circuit court stated that its role was "not to determine whether in its own opinion RCA's method of accounting for prepaid service contract income 'clearly reflect[ed] income,' but to determine whether there is an adequate basis in law for the Commissioner's conclusion that it did not." RCA Corp. v. United States,supra at 886. Relying upon the trilogy of Supreme Court decisions, the Second Circuit concluded that the Commissioner had not abused his discretion in rejecting the taxpayer's method of deferring prepaid service contract income. The court reasoned that in the trilogy, the Supreme Court prohibited the taxpayers from deferring prepaid income because the taxpayers could not determine at the commencement of the contract terms the amount of services that customers would actually demand. Therefore, as in the trilogy, the taxpayer was unable to predict with certainty the amount of income it would ultimately earn under the contracts. The Second Circuit thus has rejected a taxpayer's method of accounting which attempts to defer income recognition for prepaid services to be performed upon demand as nothing more *107 than "prognostications and assumptions about the future demand for services." RCA Corp. v. United States,supra at 888. Petitioner argues that RCA Corp.,supra, should be distinguished from the instant case. Petitioner contends that its estimates for future services were not "prognostications and assumptions about the future demand for services" but instead were "fixed and definite." In so arguing, petitioner refers us to Helvering v. Russian Finance & Construction Corp.,77 F.2d 324 (2d Cir. 1935), and Ohmer Register Co. v. Commissioner,131 F.2d 682 (6th Cir. 1942), revg. 44 B.T.A. 1347 (1941). We find petitioner's argument unconvincing and his reference cases inapposite. In exchange for prepaid service policy contract income, which was subject to petitioner's unrestricted use, petitioner contracted to perform repair services in the future upon customers' demands. The overall time frame for providing the services was set by the contract term but petitioner was not obligated to perform the services on set dates and in fact no demand for such services would necessarily be made. Petitioner's *108 books reflected monthly offsets for future services which were estimates based upon past actual services rendered to a pool of customers owning the service policy contracts. Petitioner failed to show that, based either upon the terms of its existing service policy contracts or upon historical data as related to services previously rendered to individual payees, it actually would perform its claimed estimated future services within a specific period with reasonable certainty. Without such a showing, under the principles set forth by the trilogy of the Supreme Court decisions and followed by the Second Circuit, we must conclude that petitioner's method of reporting its prepaid service policy contract income during the years in issue did not clearly reflect its income. Therefore, petitioner is not entitled to defer its prepaid service policy contract income through offsets or otherwise. The second issue for decision is whether petitioner must include in its 1975 income section 481 adjustments for fiscal years 1970 through 1974. Petitioner argues that a section 481 adjustment is not warranted because "petitioner at no time changed the method of accounting but in 1970 merely changed *109 his method of doing business which did not require Commissioner approval." On the other hand, respondent contends that petitioner utilized one method of accounting with regard to its old service policy contracts and changed to another method when it instituted its new service policy contracts in April 1970. Respondent submits that petitioner should have obtained permission from the Commissioner to change accounting methods and that because petitioner failed to secure such permission and changed to an impermissible accounting method, the Commissioner has authority to require petitioner to revert to its old accounting method and to make a section 481 adjustment to petitioner's taxable income in the year of change. [9]
*110 Petitioner's position fails to recognize that it changed its accounting method from one form of accrual accounting to another. Prior to 1970, for Federal income tax purposes, petitioner reported on its returns the full amount of its prepaid service policy contract income. After 1970, for Federal income tax purposes, petitioner reduced the amount of prepaid service policy contract income by an estimation of its future costs of performing services under the unamortized portion of the service policy contracts. It is well-settled law that change from one form of accrual accounting to another form is considered a change in accounting methods, particularly when material items are involved, as was the case with petitioner's prepaid service policy contract income. Such a change in accounting methods requires the consent of the Commissioner. Section 446; section 1.446-1(e)(2), Income Tax Regs.; Advertisers Exchange, Inc. v. Commissioner,25 T.C. 1086 (1956), affd. 240 F.2d 958 (2d Cir. 1957). In resolution of the first issue we found that, without permission of the Commissioner, petitioner changed its method of accounting after it instituted the new service *111 policy contracts in April 1970 and that petitioner's new accounting method did not clearly reflect petitioner's income. We now conclude that pursuant to section 446, the Commissioner has authority to require petitioner to revert to its original method of accounting. Accordingly, we agree with respondent that a section 481 adjustment is warranted; however, as discussed below, it does not appear to us that respondent's calculation of the section 481 adjustment is correct. Citing Graff Chevrolet Co. v. Campbell,343 F.2d 568 (5th Cir. 1965), on brief petitioner implies that if it in fact did change its accounting method, a section 481 adjustment is applicable and would affect the computation of its income with regard to taxable years otherwise closed by the statute of limitations. Petitioner's fiscal year ending October 31, 1975, is its first taxable year not otherwise closed by the statute of limitations. [10] In his notice of deficiency respondent asserts his authority under section 446 to require petitioner to revert to its original accounting method in fiscal year ending October 31, 1975. Respondent treats petitioner's fiscal year ending October 31, 1975, as *112 the "year of change" for purposes of adding the section 481(a) adjustment; petitioner does not dispute this treatment nor does it suggest that we should treat fiscal year ending October 31, 1970, as the "year of change." [11] Accordingly, for purposes of section 481 we shall treat petitioner's fiscal year ending October 31, 1975, as the "year of change." Because petitioner did not report all prepaid service contract income in the years in which it was received, an adjustment of petitioner's income is necessary "solely by reason of the change in order to prevent amounts from being * * * omitted." *113 In his notice of deficiency, respondent calculated the section 481 adjustment by adding the deductions petitioner took for estimated costs accrued on its income tax returns for taxable years ending October 31, 1970 through October 31, 1974. Respondent asserted that petitioner's income for its fiscal year ending October 31, 1975, should be increased by the full $111,072 of estimated costs accrued and previously deducted over the prior 5 years, stating that petitioner changed its method of accounting in its fiscal year ending October 31, 1970. Section 481(a) provides for an adjustment to a taxpayer's taxable income for prior years; section 481(b) sets forth limitations where the adjustment is substantial, including special rules for years affected by a net operating loss carryback or carryover. Since, on its face, respondent's statutory notice of deficiency does not seem to adhere to the section 481(b) limitations, respondent's method of computing the section 481 adjustment may not be in strict accordance with those statutory requirements. We believe that strict compliance with this statute might result in a lesser deficiency. For this reason, we consider computations under *114 Rule 155 to be necessary for our determination of petitioner's correct tax liability. The third issue is whether, in fiscal years ending October 31, 1976 and 1977, petitioner may deduct $139,700 and $227,300, respectively, for amounts paid to Associates in those fiscal years to cover personal services to be rendered to petitioner during its subsequent fiscal years. [12] In its petition, petitioner asserted that its payments were deductible in the fiscal year in which paid (fiscal years ending October 31, 1976 and 1977) because, as an accrual basis taxpayer, it is obligated "to deduct the accruals when they become unconditional and the amount is determined * * * [i.e. the] year in which the liability came into being." [13] On the other hand, on brief, citing section 1.446-1(c)(ii), Income Tax Regs., [14] respondent argues that the proper time to deduct the $139,700 and $227,130 contract payments would be the fiscal years in which the personal services are rendered by Associates' employees (fiscal years ending October 31, 1977 and 1978) because "all events necessary to determine the actual liability" and the amount "did not occur until the services of the employees were actually performed. *115 " Respondent admits that Associates did not return to petitioner any portion of these contract payments, but he suggests that the amounts could not have been fixed by arm's-length negotiations between petitioner and Associates. The parties have presented a somewhat sketchy record as to the facts surrounding this third issue, but based thereon we must sustain respondent. It is not clear that the contractual obligations to pay for services to be performed in subsequent months by Associates' employees were fixed prior to the end of fiscal years ending October 31, 1975 and 1976. The provisions *116 of the Service Agreement did not require prepayment; its terms required petitioner to make payments on a monthly, bi-monthly, semi-annual or annual basis for services "performed" by Associates. This language connotes the previous performance of services. While provision 4 states that the sums "may be payable in installments as may be mutually agreed * * * but shall become an unconditional liability * * * on the date of execution of said Appendix A," Appendix A was not introduced into evidence. The Service Agreement alone does not show that petitioner had an unconditional liability to make advance payments for the performance of services.Only the Amendment to Service Agreement refers to advance payment of funds, but by the terms of the amendment, petitioner and Associates must treat these advanced funds as loans to Associates rather than as business expenses of petitioner. Although we suspect from the evidence that the amounts that petitioner would owe Associates could be determined with reasonable accuracy in fiscal years ending October 31, 1975 and 1976, there is little explicit information in the record to confirm our suspicion. We do know that for numerous years petitioner *117 directly employed the same personnel later supplied by Associates; it is reasonable to deduce that this experience helped petitioner to anticipate its contracted labor costs in the taxable years in issue. However, petitioner has the burden of affirmatively proving that the Commissioner's deduction disallowance is incorrect. Welch v. Helvering,290 U.S. 111 (1933); Tax Court Rules of Practice and Procedure, Rule 142(a). Petitioner has failed to meet its burden of proof, and thus we sustain respondent's determination on this issue. The fourth issue for decision is whether petitioner's $24,000 reserve for bad debts, utilized as a writeoff against outstanding receivables for taxable year ending October 31, 1975, was reasonable. On brief, petitioner asserts that it determined the debt reserve amount by relying upon "national statistics in the electronic industry," and that such statistics indicated an average bad debt reserve of 5 percent to 5.5 percent. At trial and on brief petitioner failed to show why its business should be considered as part of the electronic industry and failed to present data on its bad debt experiences in prior years. Petitioner has the *118 burden of proving that the Commissioner's $6,000 reduction in the reserve was inappropriate. Welch v. Helvering,supra;Tax Court Rules of Practice and Procedure, Rule 142(a). Petitioner did not meet its burden of proof; consequently, respondent's determination must be sustained. The final issue for decision is whether all or a portion of petitioner's underpayment of taxes is due to negligence within the meaning of section 6653(a). Respondent argues that "since petitioner introduced no evidence to rebut the Commissioner's determination that all or part of the underpayment of tax is due to negligence, respondent must prevail on this issue." Petitioner offered no evidence to support a finding that its underpayments were not due to negligence. In fact it has made no argument with respect to the negligence issue. We sustain respondent's determination of the additions to tax under section 6653(a). Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise stated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years here in issue.↩
2. The fiscal years ending October 31, 1973 and 1974 are before the Court only because of the disallowance of net operating loss carrybacks previously allowed and investment tax credit carrybacks. At the time of the mailing of the notice of deficiency, it appears that the statute of limitations barred any other adjustments. The issues here therefore relate to the fiscal years ending October 31, 1975, 1976 and 1977. Whether there are net operating loss carrybacks and investment tax credit carrybacks in excess of those allowed by respondent is merely a matter of computation following the disposition of the issues presented for fiscal years ending October 31, 1975, 1976 and 1977.↩
3. At trial, petitioner's president testified that petitioner's business practice of refunding a pro rata portion of the service policy contracts' sales proceeds did not commence until after April 1970.↩
4. Petitioner's president testified that after April 1, 1970, petitioner honored this provision regarding the refund of the unused pro rata portion of the service policy contracts.↩
5. In its petition, petitioner implies that the new corporation was formed to finance petitioner's inventory. While this may have been one purpose, we find nothing in the record to support this as the major reason.↩
6. The parties failed to attach Appendix A to the Court's copy of the Service Agreement.↩
7. Beacon Publishing Co. v. Commissioner,218 F.2d 697 (10th Cir. 1955), revg. 21 T.C. 610 (1954), involved a newspaper publisher that received prepaid subscriptions for periods of 30 days to 5 years. The taxpayer had reported the prepaid subscription income ratably over the subscription periods. The circuit court held that the prepaid subscription income was not reportable at the time of receipt even though the taxpayer had unobstructed use of the funds at that time. The court allowed the taxpayer to spread the prepaid subscription income over the unexpired subscription periods. In Schuessler v. Commissioner,230 F.2d 722 (5th Cir. 1956), revg. 24 T.C. 247↩ (1955), the taxpayer sold furnaces for approximately $20 to $25 more than his competitors. In return for the increased price, the taxpayer agreed to turn the furnaces on and off every year for the subsequent 5 years. The taxpayer established a reserve for the estimated future costs for this service. He computed his income for the year of sale by reporting his total profit and then deducting the amount of the reserves, thereby effectively deferring income in an amount equal to the estimated future expenses. The circuit court permitted the taxpayer's method of accounting.
8. Several commentators have similarly evaluated the trilogy of Supreme Court decisions. See Seago, "What Chance for Prepaid Income Deferrals Based on Statistical Estimates After RCA?" 54 Journal of Taxation 16 (January 1981), and Malman, "Treatment of Prepaid Income--Clear Reflection of Income or Muddied Waters," 37 Tax Law Review 103↩ (1981).
9. Secs. 481(a) and (b) provided: SEC. 481. ADJUSTMENTS REQUIRED BY CHANGES IN METHOD OF ACCOUNTING. (a) General Rule.--In computing the taxpayer's taxable income for any taxable year (referred to in this section as the "year of the change")-- (1) if such computation is under a method of accounting different from the method under which the taxpayer's taxable income for the preceding taxable year was computed, then (2) there shall be taken into account those adjustments which are determined to be necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted, except there shall not be taken into account any adjustment in respect of any taxable year to which this section does not apply unless the adjustment is attributable to a change in the method of accounting initiated by the taxpayer.
(b) Limitation on Tax Where Adjustments Are Substantial.-- (1) Three year allocation.--If-- (A) the method of accounting from which the change is made was used by the taxpayer in computing his taxable income for the 2 taxable years preceding the year of the change, and (B) the increase in taxable income for the year of the change which results solely by reason of the adjustments required by subsection (a)(2), other than the amount of such adjustments to which paragraph (4) or (5) applies, exceeds $3,000, then the tax under this chapter attributable to such increase in taxable income shall not be greater than the aggregate increase in the taxes under this chapter (or under the corresponding provisions of prior revenue laws) which would result if one-third of such increase in taxable income were included in taxable income for the year of the change and one-third of such increase were included for each of the 2 preceding taxable years. (2) Allocation under new method of accounting.--If-- (A) the increase in taxable income for the year of the change which results solely by reason of the adjustments required by subsection (a)(2), other than the amount of such adjustments to which paragraph (4) or (5) applies, exceeds $3,000, and (B) the taxpayer establishes his taxable income (under the new method of accounting) for one or more taxable years consecutively preceding the taxable year of the change for which the taxpayer in computing taxable income used the method of accounting from which the change is made, then the tax under this chapter attributable to such increase in taxable income shall not be greater than the net increase in the taxes under this chapter (or under the corresponding provisions of prior revenue laws) which would result if the adjustments required by subsection (a)(2), other than the amount of such adjustments to which paragraph (4) or (5) applies, were allocated to the taxable year or years specified in subparagraph (B) to which they are properly allocable under the new method of accounting and the balance of the adjustments required by subsection (a)(2), other than the amount of such adjustments to which paragraph (4) or (5) applies, was allocated to the taxable year of the change. (3) Special rules for computations under paragraphs (1) and (2).--For purposes of this subsection-- (A) There shall be taken into account the increase or decrease in tax for any taxable year preceding the year of the change to which no adjustment is allocated under paragraph (1) or (2) but which is affected by a net operating loss (as defined in section 172) or by a capital loss carryback or carryover (as defined in section 1212), determined with reference to taxable years with respect to which adjustments under paragraph (1) or (2) are allocated.↩
10. On October 9, 1978, petitioner consented on Form 872-A to extend the period of limitation for assessment of its income taxes for its fiscal year ending October 31, 1975. ↩
11. If in fact petitioner's fiscal year ending October 31, 1970, were to be considered the "year of change," the preceding taxable year would be petitioner's fiscal year ending October 31, 1969. Under these circumstances, the change would be from a method of accounting including in income all prepayments received on service contracts to a method reducing the amount of prepaid service contract income by an estimation of its future costs of performing services under the contracts. Neither party argues that it is petitioner's accounting change made in fiscal year ending October 31, 1970, for which respondent should be allowed to adjust income for years prior to fiscal year ending October 31, 1970. In fiscal year ending October 31, 1975, respondent returned petitioner's method of accounting to petitioner's original method and thus the parties treat this change as the change triggering section 481.↩
12. The timing of deductibility is the sole issue raised by the parties; respondent accepted the amounts as reasonable and ordinary and necessary business expenses. ↩
13. Petitioner did not submit any expansion of this argument on brief. ↩
14. Sec. 1.446-1(c)(ii), Income Tax Regs., in pertinent part provides: (ii) Accrual method.↩ * * * Under such a method, deductions are allowable for the taxable year in which all the events have occurred which establish the fact of the liability giving rise to such deduction and the amount thereof can be determined with reasonable accuracy. * * *